## TITUS v. WHITESIDE et al.

### (District Court, N. D. California, Second Division.  January 11, 1916.)

### No. 15611.

1. CONTRACTS ⊚⟲237—MODIFICATION—NECESSITY OF CONSIDERATION.

Under a contract between T., a cruiser and examiner of timber lands, and M., a dealer in timber and timber lands, T. was to examine and purchase timber lands in M.'s name, and have a one-fourth interest in the net profits, or at his option an undivided one-fourth interest in the lands and timber.  The contract did not specify or limit the quantity or acreage of land contemplated to be acquired.  *Held* that, as to each parcel of land purchased in accordance with the contract, the contract became on T.'s part an executed contract the moment title was acquired, and the contract was no longer executory, and could not be changed or modified as to T.'s rights without adequate consideration.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1119–1122; Dec. Dig. ⊚⟲237.]

---

⊚⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CONTRACTS ⊚⟿247 — CONSIDERATION — PRESUMPTIONS AND BURDEN OF PROOF.

Under a contract between T. and M., T. was to examine and purchase timber lands, for which M. was to pay, and was to receive a salary of $150 a month, and in addition a one-fourth interest in the net profits, or at his option a one-fourth interest in the lands and the timber. A subsequent contract purported to cancel the first contract, and, after reciting that M. was the owner of about 10,000 acres of land, provided that he agreed to give T. 5 per cent. of the actual amount received upon sales of the timber; that T. had no interest in the timber or the lands; that, if the profit from the sale of the timber should not amount to 25 per cent., the 5 per cent. to be received by T. should be reduced accordingly; that T. should have no interest in any other lands which had been or might be purchased by M.; and that T. should receive no salary, but only actual expenses in looking at timber and paying other parties for estimating such timber. *Held* that, while the writing imported a consideration, the disparity between the provisions of the two contracts as to T.'s compensation and the lack of any sufficient reason for T.'s execution of the second contract, by which he gave up a large interest in profits and a right to salary, and continued performing services for M. for which it was claimed that he was entitled to no compensation, overcame the presumption of consideration arising from the writing, and shifted to those relying on the second contract the burden of proving a consideration therefor.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1139, 1787; Dec. Dig. ⊚⟿247.]

3. CONTRACTS ⊚⟿176—CONSTRUCTION—QUESTIONS OF LAW OR FACT.

T.'s right to compensation for services rendered by him under the second contract was not a question of fact, but one of law, dependent upon the construction to be put upon the terms of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 767–770, 917, 956, 979, 1041, 1097, 1825; Dec. Dig. ⊚⟿176.]

In Equity. Bill by Mattie B. Titus, administratrix of W. H. Titus, deceased, against Robert B. Whiteside and another, executors of John McAlpine, deceased, and others. On report of a master. Exceptions to the report sustained, and cause recommitted to the master, with directions.

Charles A. Shurtleff, of San Francisco, Cal., for plaintiff.
Gillett & Cutler, of San Francisco, Cal., for defendants.

VAN FLEET, District Judge. The bill seeks to enforce the provisions of a contract entered into December 9, 1905, between plaintiff's testator, W. H. Titus, and John McAlpine, testator of defendants; and for an accounting thereunder. In substance, the contract provided that Titus, a resident of Beckwith, Cal., "a cruiser and examiner of timber and timber lands," was to examine and purchase timber lands in this state, the title to be taken in the name of McAlpine, a resident of Duluth, Minn., described in the contract as "a dealer in and handler of timber and timber lands," and who, the contract contemplated, should advance the necessary funds. McAlpine was to pay to Titus $150 per month, Titus to pay his own expenses, but to have in addition to his salary a one-quarter interest in the net profits resulting from the disposition of the lands to be purchased and the timber thereon, after deducting the purchase price, expenses of acquisition, taxes,

carrying charges, and interest at 5 per cent. on the moneys advanced by McAlpine, with an option in Titus, in lieu of his interest in the net profits, to receive title to an undivided one-quarter interest in the corpus of the lands and timber at any time he might elect to pay one-quarter of the purchase price, carrying charges, expenses, and interest as aforesaid. The contract provided that McAlpine could terminate it at any time he might see fit, and that thereupon the salary of Titus should cease at the end of the then current month and his services thereunder be at an end. It did not specify or limit the quantity or acreage of land contemplated to be acquired under its provisions. The bill alleges the performance of services by Titus in the acquisition of title to a large acreage of land—some 34,000 acres—in pursuance of the terms of the contract, down to the date of his death in October, 1911, and that the provisions of the contract in the acquisition of such lands had been fully kept and performed by him.

The answer admits the making of the contract sued on, but alleges that it "became annulled and canceled on the 19th day of February, 1908, by an agreement in writing," which is set out as an exhibit; alleges that Titus' services under the first contract ceased upon the execution of the second; denies that Titus "kept or performed all the conditions or stipulations" of the first contract, or that the lands described in the bill were acquired thereunder, or that Titus at the time of his death had any interest whatsoever therein. The contract set up in the answer purports by express terms to "take the place of" and cancel the prior contract of December 9, 1905. Its pertinent recitals and provisions are that McAlpine, the party of the first part, "being the owner of about ten thousand (10,000) acres of lands in townships 21 and 22 north, ranges 13 and 14 east, Plumas and Sierra counties, in the state of California, agrees to give to said second party five per cent. (5%) of the actual amount received when said first party sells the timber on the lands above referred to, and as soon as payment is received by first party, the said second party having no interest whatsoever in the timber or lands referred to and only to receive the five per cent. (5%) when the timber is sold by the party of the first part, providing, however, that the amount received by the first party from the sale of said timber shall amount to more than twenty-five per cent. (25%) net profit over and above the purchase price and all carrying charges thereto added, with interest at the rate of six per cent. (6%), including also taxes and all other necessary expenses, and if sold for less than twenty-five per cent. (25%) profit, the five per cent. (5%) above referred to, to be received by second party, shall be reduced accordingly. The said second party has no interest whatsoever of any kind or nature in the lands or timber referred to, said first party being the sole owner in fee simple of the lands and timber referred to above, and to any other lands which the party of the first part may purchase or may have purchased heretofore. The said second party shall have no interest whatsoever in the profits of same, having only purchased same as directed by the party of the first part, and all lands so purchased shall be in the name of the first party. The party of the second part shall receive no salary, only actual expenses in looking at timber

and paying other parties for estimating same." Then follow some provisions having no relation to present consideration.

By stipulation, the cause was sent to the master, "to take and report the evidence together with his findings of fact and conclusions of law thereon." On the case coming before him, the master determined, with the consent of the parties, that, in view of the issues raised by the pleadings as to whether the contract sued on still subsisted, he should first take the evidence and "report such matter as would furnish the basis for an interlocutory decree, that is to say, whether the second contract was ever in fact executed; that then, after the court had passed on this report, an accounting could be had," if deemed necessary. This course was pursued, and the master has filed such preliminary report, in which he finds that the contract set up in the answer was executed by Titus and supplanted the first, and this finding has given rise to the pending question. The materiality of the exception hereafter considered will be better appreciated by a brief statement of some of the peculiar features of the case as disclosed in the master's report.

The execution by Titus of the alleged second contract was sharply denied by plaintiff, and his purported signature thereto, which was unusual in character, was denounced as a forgery; the question of its genuineness affording the basis of a very decided conflict in the evidence, with a number of witnesses familiar with the handwriting of the deceased denying its genuineness, and the two experts examined on the subject being diametrically opposed in their opinions. In addition, there were a number of facts and circumstances appearing in evidence and discussed by the master of a more or less doubtful and discrediting character—alleged declarations of McAlpine after the date of the second contract at variance with its terms as to Titus' interest in the lands; his actions after the death of Titus, and representations to the latter's widow, with other matters—tending more or less strongly to disparage the genuineness of the instrument. Not the least potent of these facts in the consideration of the master was the peculiar terms of the second contract and the disparity between its provisions and those of the first as to the compensation or emolument going to Titus, with a want of any sufficient reason appearing to explain why the latter should have been ready to voluntarily forego the rights accruing to him under the first—rights which, as the master indicates, had become vested. On this subject the master says in his report:

"It is possible, of course, that Titus may have concluded to abate from the compensation which he had earned in order to continue friendly relations with McAlpine. His purpose in so doing, however, and his subsequent actions, are difficult to explain on the basis of the second agreement as the contract defining their relations after February, 1908. By the terms of the second agreement it is seen that Titus would get no additional compensation for any future service in McAlpine's behalf. For his own interest, he might as well have quit at once. On the contrary, however, he was active in McAlpine's behalf up to the time of his death, looking up further timber lands, procuring abstracts, having the timber cruised, negotiating purchases, etc. It cannot be told whether it took all of his time, but there is no question but that it took a substantial portion of his time, during those years. Why would

any reasonable man execute such a contract and give his services in this way? This question has not been completely answered."

And, after adverting to certain suggestions of the defendants' counsel, he says:

"When all of this is said, however, it must be acknowledged that, even if we believe that Titus executed the second contract, it is hard to give a satisfactory reason why he did so, and why he spent so much of his time thereafter in McAlpine's service. This must be left one of the unanswered questions in this case."

The master's conclusion, however, arrived at apparently with great reluctance, was that, notwithstanding these disparaging considerations, he was constrained by the positive evidence of the two subscribing witnesses, which he deemed controlling in effect, to find that the instrument had in fact been subscribed and executed by Titus. In this regard he says:

"The case is not easy to decide. It has been given very careful consideration by me. The burden of proving the second agreement, as hitherto stated, is on the defendants. If the agreement as presented bore simply the purported signatures of McAlpine and of Titus, I should say that the defendants had failed to maintain this burden of proof in this case. This means that the evidence as to handwriting and surrounding circumstances is at least no more than balanced. But with the additional, and to my mind the controlling, evidence of the subscribing witnesses as to execution, this balancing of the evidence operates to the detriment of the plaintiff. To my view, plaintiff's evidence is not sufficient to overcome the evidence of the subscribing witnesses."

While a number of exceptions to the report are assigned, but two are urged, and but one of those demands special notice. The master having failed in his draft report to find upon the question of the consideration moving Titus in the execution of the second contract, the report was excepted to by the plaintiff on that ground, and he was requested to make a specific finding on the subject. This he has failed to do, for what reason does not appear; his report as finally settled and filed being silent upon the subject. The plaintiff has now renewed the objection by an exception to the report on that ground; and I am of opinion that the exception should be sustained.

In its contrasting features with the contract sued on, the second contract is certainly rather remarkable in its terms, and it is difficult, as suggested by the master, to readily imagine why one in Titus' place should have been ready to abandon his rights under the first and adopt the second, in the absence of some adequate consideration moving him to such action. As aptly urged by plaintiff:

"Not only did Titus by signing the second contract give up an interest in profits worth more than $45,000 and a right to salary amounting to $2,100, but the evidence shows without contradiction—in fact, it is admitted—that Titus continued an unbroken course of buying for McAlpine, and after February 19, 1908, the date of the second contract, purchased approximately 24,000 acres of timber land, the title to which stood in McAlpine, making a total with the 10,000 acres purchased prior to February 19, 1908, of about 34,000 acres, for which services it is claimed he is not entitled to one cent, so by signing the second contract he not only gave up what we have heretofore set forth, but he gave up his time for three years and eight months thereafter, which we have seen was devoted to acquiring more than twice as much land

as he acquired prior to February 19, 1908, without salary, and waived all interest in the lands or in the profits therefrom."

This statement of the effect of the second contract accords substantially with the facts as recited in the master's report; and a consideration being as essential to the validity of a contract as its formal execution, it seems to me that the case is peculiarly one where some adequate consideration should have been shown and specifically found.

[1] The position taken by the defendants is:

"That, the contract being an executory agreement, the parties had the right, at any time before it became fully executed and complete, by mutual consent to change its terms, or rescind or modify it in any particular, and that no consideration other than their mutual promises was necessary."

And many authorities are cited in support of the doctrine. There is no question as to the general correctness of the principles stated, but they lack application. The contract of December 9, 1905, had ceased to be executory at the date of the second agreement. As we have seen, it did not undertake to specify the acreage or number of tracts of land to be acquired under its provisions, but merely stated the terms upon which any land acquired should be purchased. This being so, it necessarily results as matter of construction that, as to each parcel purchased in accordance with its terms, it became on the part of Titus an executed contract the moment the title to the particular parcel had been vested in McAlpine. All that remained for performance thereafter as to any such purchase were the stipulations and covenants of the latter. Under these circumstances, the contract was no longer executory as to Titus, and could not be competently changed or modified as to his rights thereunder without adequate consideration. The rule is thus stated in Cyc. (9 Cyc. 594):

"While a contract remains executory on both sides, an agreement to annul on one side is a consideration for the agreement to annul on the other, and vice versa. On the other hand, if the contract has been executed on one side, an agreement without any new consideration that it shall not be binding is without consideration and void."

See, also, George v. Lane, 80 Kan. 94, 102 Pac. 55; Zerr v. Klug, 121 Mo. App. 286, 98 S. W. 822; Weed v. Spears, 193 N. Y. 289, 86 N. E. 10; Empire State Surety Co. v. Hanson, 184 Fed. 58, 107 C. C. A. 1; Wilson v. Wilson, 115 Mo. App. 641, 92 S. W. 145.

[2] Defendants further say in their brief:

"There was no evidence introduced at the hearing before the master as to what the consideration was, if any, for the second agreement. The contract, being in writing, presumes a consideration, and the burden of proof rests upon the party attacking the contract to show that no consideration existed."

It is perfectly true that the writing imports a consideration, but the effect of this implication is merely to support the validity of the writing and dispense with extraneous proof, where there are no facts or circumstances tending to negative the existence of an adequate consideration. Here, it is hardly necessary to suggest, the circumstances disclosed in the evidence and commented on by the master were more than adequate to overcome the presumption of consideration arising

from the writing itself, and to shift the burden of proof on that question to the shoulders of the defendants. Very slight evidence is sufficient to shift the burden of proof as to a negative fact. People v. Lundin, 120 Cal. 308, 52 Pac. 807; Joost v. Craig, 131 Cal. 504, 63 Pac. 840, 82 Am. St. Rep. 374. A want of consideration may appear or be shown from the circumstances surrounding the making of the contract. Thus:

"On an issue as to whether any real consideration for a written instrument passed between the parties, circumstantial evidence may be resorted to, such as the relative condition and circumstances of the parties, their means and revenues, their subsequent conduct, the influence of one over the other, the fact that the price was nominal, and generally such matters of fact as conduce to establish the charge of a want of consideration." 3 Encyclopedia of Evidence, p. 376.

It may be added that under the rule of decision in Minnesota, in which state the second contract was made and executed, and under which, therefore, its validity is to be tested, rather than by the law of the state of its performance, this contract is void without a new consideration appearing. Thus, in Little v. Rees, 34 Minn. 277, 26 N. W. 7, where the plaintiffs were to get commissions on a sale for introducing a purchaser, it was held that a promise, made after performance on their part, not to charge the commission, was void for want of consideration; the court saying:

"This promise or statement was made after the contract had been entered into, and the plaintiffs, as is found, 'had then done and completed all that was required of them under their contract with defendant.' So far as appears, the promise was a mere naked agreement, without consideration, and could have no legal effect."

See, also, Bryant v. Lord, 19 Minn. 396 (Gil. 342); King v. Duluth R. R. Co., 61 Minn. 482, 63 N. W. 1105.

[3] The other of the two exceptions urged by plaintiff, as to the want of a finding by the master on the question of plaintiff's right to compensation for services rendered by Titus under the second contract, is, in view of the conclusion reached on the exception above discussed, not now material. It will become material only in the event the second contract shall be finally sustained as based upon a valid consideration. But, moreover, should the question become material, it is not one of fact to be found by the master, but purely a question of law, dependent upon the construction to be put upon the terms of the second contract, which, if that contract be established, will be for the court in formulating its interlocutory decree and fixing the basis of an accounting between the parties thereunder.

These considerations require that the exception first considered be sustained; and as the omission to find on the question of consideration underlies the substantive conclusion reached by the master in his report, the order will be that the cause be recommitted, with directions to the master to take such evidence as either party may present upon the question of consideration moving the execution of the so-called second contract, and thereupon to recast his report accordingly.